WISE v. WISE.

1. STATUTE OF FRAUDS.—A PAROL AGREEMENT between husband on reconciliation with his wife to give her a tract of land and certain personal property, is obnoxious to the statute of frauds and cannot be enforced, although he purchased the property in his own name, lived with her therein, and moved away, leaving her in possession.
2. ALIMONY.—In this State alimony will be given: (1) for desertion of wife; (2) for *saevitia* under the civil law; and (3) for practicing

obscene and revolting indecencies in the family circle, but evidence in this case does not entitle the wife to alimony on either ground. MR. JUSTICE POPE *dissents as to the application of the evidence.*

Before BUCHANAN, J., Richland, October, 1899. Affirmed.

Action for alimony by Harriet C. Wise, by her guardian *ad litem,* Levi Shroder, against Daniel Wise. From judgment on Circuit in favor of defendant, plaintiff appeals.

*Messrs. Jno. T. Duncan* and *Bachman & Youmans,* for appellant. Oral arguments.

*Messrs. Andrew Crawford* and *R. W. Shand,* contra. Oral arguments.

April 18, 1901. The opinion of the Court was delivered by

MR. JUSTICE POPE. On the 14th day of February, A. D. 1898, this action was begun. The complaint in effect alleged that the plaintiff, Harriet C. Wise, became the wife of the defendant, Daniel Wise, on the 8th day of April, 1896, in the county of Richland, in this State, and that they resided in said county and State; that said wife, Harriet C. Wise, was always a dutiful wife to her said husband; that on the 16th day of November, 1896, the defendant, Wise, deserted the plaintiff, his wife, leaving her penniless, and soon after said Daniel Wise reached the State of Ohio, he began an action in one of the Courts of said State of Ohio for divorce, alleging that the plaintiff, his wife, had been criminally intimate with a negro boy, Thomas Thompson, and others; that as soon as he was confronted with her answer of indignant denial of such foul charges, he recanted and humbly apologized for such insults, and dismissed said suit; that upon his return to the State of South Carolina, he ardently sued for peace with the plaintiff, his wife, and he was conditionally forgiven, and the conditions, amongst others, were that he would provide the plaintiff with a home and the personal

property mentioned and set down in the exhibits with the complaint, all of which he did, except that no writings were executed between them; that the defendant began again to abuse and maltreat the plaintiff, his wife, failing to supply her necessities in food and raiment; that the plaintiff gave birth to a daughter on the 8th June, 1897; whereupon, so poorly did he provide for the wants and needs of his wife and child, that under the direction of Dr. Robert Earle, the plaintiff and her daughter were carried to the house of her foster parents, where she remained for two months; that his cruelty by word and deed was so great that when he proposed to take the plaintiff to the city of Columbia to live, she declined to leave the home he had provided for her, though he left her penniless. That the defendant has considerable means. That the plaintiff prays that the defendant may be required to pay over to her a sufficient sum of money, as alimony, which will support the plaintiff and her babe. And that the defendant, Wise, may be decreed to turn over by deed the house and lot of fifteen acres and the personal property, in accordance with his promise made at the time of their reconciliation, in the first of the year 1897.

The defendant by his answer admits his intermarriage with the plaintiff; he denies all allegations of neglect or cruelty by word or act; he alleges that his wife refused to go to Ohio with him on 16th November, 1896; he alleges that the divorce suit was instituted while smarting under a sense of his wrongs at the hands of his wife and while maddened by reports of her infidelity to him—the latter of which soon proved utterly groundless; that he became reconciled to his wife after his apologies to her; that he denies that he cursed and abused her, or that he neglected or refused to supply her with proper food or appropriate raiment, or that he threatened their child; that this defendant attributes all the wrongs he has and is suffering from his wife to her foster parents, who are influenced by spite and hatred to him, and also by a desire to possess or control the worldly goods of which he is the owner. Indeed, his answer may be denominated a

denial of any injurious allegations in plaintiff's complaint.

Under an order of one of the Judges of the Court of Common Pleas, all the issues of law and fact were referred to the master. The cause came on for trial before the Hon. O. W. Buchanan, as presiding Judge, in the year 1899. By his decree he denied the plaintiff any relief, but directed her to turn over the fifteen acres to her husband. From this decree the plaintiff has appealed as follows:

"I. That his Honor, the Circuit Judge, erred in the following findings and holdings in his decree: 1. 'That the plaintiff has not sustained the allegations of her complaint by the preponderance of the testimony.' Whereas, he should have decided that she has sustained them. 2. 'That the defendant has not deserted his wife, but she him.' Whereas, he should have decided that defendant has twice deserted her. 3. 'That the defendant has offered in good faith, I think, to receive her back, which will prevent a decree for alimony.' Whereas, he should have decided that defendant's offer was not a sincere and *bona fide* offer, to treat her with conjugal kindness and affection, on which she could with safety to her life and health rely, but that her living with him in the relation of wife would be the risk of peril to her, and that said offer does not prevent a decree for alimony. 4. 'Nor do I find in the case any legal testimony which would justify the Court in directing the defendant to convey the land mentioned in the complaint to his wife.' Whereas, he should have decided that the testimony showed that the defendant held the legal title to said land in trust for her as the equitable owner, and justified the Court in so directing. 5. 'That she is not entitled to any of the relief demanded by her.' Whereas, he should have decided that she is entitled to all of the relief demanded by her. 6. 'The testimony shows that she has taken and retained possession of the land described in the complaint, her right to which she submitted to the Court for adjudication.' Whereas, he should have decided that she simply remained in the house that he had

built for her, in which she was left when he last deserted her, and of which she was the equitable owner.

"II. That his Honor erred in not making the following findings and holdings, in two aspects of the case, as to both of which the decree is entirely silent: 1. That during both periods of their coverture, when they lived together, defendant treated plaintiff with such cruelty, as justified the granting of alimony for herself and support for their child. 2. That defendant was guilty of such indecencies in his family as justified the plaintiff's claims.

"III. 1. That his Honor erred in ordering and decreeing that 'defendant have leave to enter up judgment of dismissal of complaint, with a direction to plaintiff to surrender to him, without future waste, the possession of the land described in the complaint.' Whereas, he should have ordered and decreed that plaintiff have the relief sought in her complaint, and that defendant convey to her in fee the land described in the complaint."

I am not disposed to interfere with the Circuit decree, so far as it relates to the findings of fact and conclusions of law reached by the Circuit Judge as to the fifteen acres of land, whereon a dwelling house now occupied by the plaintiff, as well as to the personal property, a list of which is attached to the complaint. It is a dangerous precedent to adjudge that such fifteen acres of land, the title to which was taken by Daniel Wise after the agreement connected with the reconciliation between the plaintiff and defendant, in January, 1897, should be conveyed to plaintiff. The statute of frauds and perjuries were intended, no doubt, to prevent just such contracts being enforced in the Courts of the country; all of such contracts are in parol.

In disposing of this appeal, I will *first* consider and state the law in this State governing cases for alimony; and *second,* how the conduct of the wife after ill usage by the husband in condoning such previous ill usage, is to effect the consideration of the matter of renewed ill usage ensuing upon her condonation of previous ill usage.

First. Ever since the case of *Jelineau* v. *Jelineau,* 2 DeS. Eq., 45, it has been decided that the court of equity has jurisdiction to hear and determine questions relating to the remedy of alimony. As the Court remarked in that case, that in England questions as to the allowance of alimony were heard and determined by the ecclesiastical courts, while here there are no such courts. But, continuing the discussion, the Court held in the case just cited: "On examining the law establishing this Court" [equity] "we find it has all the powers granted it incident to a Court of Chancery; and its jurisdiction is not in any measure restricted, except in cases when the party can have complete and adequate remedy at law." And the doctrine there announced has been steadily adhered to ever since. The court of equity having jurisdiction to hear and determine cases for alimony, let us see under what circumstances it will exercise such power. *Hair* v. *Hair,* 10 Rich. Eq., at page 173, stated the first ground of divorce to be "for bodily injury inflicted *or threatened* and impending, amounting to the *saevitia* of the civil law, which may be defined to be personal violence actually inflicted or menaced, and affecting life or health." In the same case the *second* ground of divorce is stated to be "the desertion of the wife by the husband." And the *third* ground of divorce as stated in the case cited exists in cases "in which, though the husband has inflicted or threatened no bodily injury upon the wife, yet practices such obscene and revolting indecencies in the family circle, and so outrages all the sentiments of delicacy and refinement characteristic of the sex, that a modest and pure-minded woman would find these grievances more dreadful and intolerable to be borne than the most cruel inflictions upon her person; she would be held justified in fleeing from the polluting presence of that monster, with whom in an evil hour she had united her destinies." These three grounds for granting alimony in this State were expressly recognized by this Court in *Briggs* v. *Briggs,* 24 S. C., at page 380. The caution in cases of alimony is invariably recognized,

"that no words of reproach and insult amount to legal cruelty; no affront and indignity, no torture of the feelings and sensibilities, however severe and grievous to be borne, unaccompanied by bodily injury, or a well grounded apprehension of such, will authorize the wife to leave the bed and board of her husband, and to claim thereupon from this Court a decree for alimony." *Rhame* v. *Rhame,* 1 McC. Chancery, 205; following the case of *D'Aquilar* v. *D'Aquilar,* 1 Hag., 329. But, added to these words of caution, the Court, in *Hair* v. *Hair, supra,* observes: "But words of *menace, intimating a malignant intention to inflict personal injury that might affect the security of life or health,* constitute such legal cruelty as would justify the wife in withdrawing from the presence of the husband and claiming against him a decree for alimony. The Court must not wait till the threats are carried into execution, but must interpose when they raise a reasonable apprehension of personal violence, and excite such terror as to make life intolerable." I might quote from the English cases at length, but they are so fully set forth in the previous opinions of this Court in its decisions in cases for alimony, I scarcely deem it necessary. To give point to the foregoing observation, I might as well state that the position of the appellant, pointing to the desertion of the wife by the husband in the cause at bar, cannot be said to be sustained by the testimony offered for that purpose; I say this, not because the testimony as to the conduct of the respondent convinces me that he is incapable of deserting his wife, for he slipped away from her in November, 1896 (concerning which escapade I shall hereafter refer), and what a man has once done he may do again, but because it is not proved that he has actually deserted her, as yet. The appellant lays great stress upon the *saevitia* practised by Daniel Wise; it is not charged that he has actually struck her; but to my mind, as I hope to show hereinafter, he has filled her mind with terror by his threats to kill her, to kill their baby girl; to starve her by feeding her on pine roots and pine straw; to let her die by inches when sick

by neglect, and refusal to employ a physician, and a neglect to provide her with the food and the service proper for a person languishing upon a bed of sickness—all of which charges will be referred to hereafter in the hearty discussion of the facts in testimony.

I will next consider the application of the testimony setting forth the desertion of the wife by the husband in 1896; the foul charges made by him in his bill for divorce from his wife, filed in the Court of Ohio; his attempt to frighten witnesses to bear false testimony against the virtue of his wife in such Court of Ohio; his abject confession of his terrible wrong to his wife in making such false charges of infidelity to her marital vows by his wife, and yet the wife afterwards, on the earnest plea of this husband for forgiveness and a reconciliation, and at her foster mother's solicitation, condones such terrible insults by going back to a life with him as a husband. It is true, that the wife cannot *on such grounds* as the basis therefor obtain a decree for alimony against her said husband. But it is perfectly legitimate for her to put those facts in testimony, in order to show his character as a man destitute of truth, and capable of inflicting the wrongs as charged by his wife and denied by him. In the case, *Threewits* v. *Threewits,* 4 DeS. Eq., 571, the Court, in speaking of the effect of the wife returning to her husband after the latter had ill treated her, and in reply to the objection that all the ill usage "which might have warranted the wife separating herself from the husband and obtaining the protection of this Court, occurred before their last reunion, and that she went away the last time without any real ill usage or any just provocation; and that her husband is willing to receive her back and treat her tenderly as a wife ought to be treated," said: "If this was the real state of the case, and there was good reason to believe that this offer was the genuine effusion of a mind repenting its past errors and seeking occasion to remedy them, it would make a material alteration in the case. * * * It is manifest from this lady's whole conduct, and particularly by her

28—60

repeatedly returning to him on his promise of reformation
and better treatment, that she was sincerely attached to him.
It is equally manifest that the husband has violated those
promises.    He obtained her return the last time by a promise
made upon oath of reformation. * * * It is in full proof
that he violated that oath * * *'' Under these facts, in the
case just cited, the Court granted the divorce, notwithstand-
ing the wife's condonement.    But in the case at bar no facts
are relied upon, but the previous bad conduct of the husband
is introduced for the reasons previously intimated by me.    It
is not every husband who has wronged his wife who is to be
believed when he promises reformation, and asserts he is
willing and anxious to receive again his wife.

To summarize.    The law in this State is that alimony is
allowed to the wife: 1st. For desertion of the wife by the
husband.    2d. For *saevitia* under the civil law.    3d. For
such offensive conduct as would shock a woman's moral
nature.

The previous conduct of the husband may be offered in
evidence, after a wife's return to and reconciliation with her
husband, to illustrate his perfidy in the conjugal relation—
to illustrate how untruthful his statements may be, as well as
to show how his wife was willing to trust to his protection
after he had once violated his vows.

I will now examine the testimony, to see if he has been
guilty of conduct amounting to *saevitia* to his wife, and also
to learn if the Court should trust his protestations of a
willingness, in good faith, once more to entrust his wife to
his control.    I confess with great regret that at the close of
the argument my judgment was strongly influenced by the
showing made on behalf of the defendant, but a study of
this testimony for myself has changed my opinion com-
pletely.    Great stress is laid upon the expressions of his
neighbors in regard to Daniel Wise's deportment while
living among them, as being peaceable and pleasant, upright
and honest.    It must be remembered that Daniel Wise came
into that neighborhood on his marriage, the 8th day of April,

1896, and that he lived there until 16th November, 1896; that he returned on 16th February, 1897, and staid there one year longer. So that he has lived among those people one year and seven months. The fewest number of his neighbors testified to breaking bread at his board and none to the fact that they had spent the night under his roof. It is true, that he paid cash for everything he bought. But you will read the testimony in vain to learn of a single instance where a substantial neighborly kindness was shown by Daniel Wise to one of his neighbors. It is easy to speak of a man's life being peaceable and orderly, free from oaths and coarse speeches, if no one is allowed or suffers himself to get really close in touch to the person in question. "I have heard nothing against him." "His neighbors say nothing against him." * * * Is it any wonder if none of them came in close touch with such a man? What do people say, who have come in close touch with him? What do Mr. and Mrs. Shroyer say of him? First and foremost, what does Wise say of himself? Well, before he came to the Atlanta Exposition in 1895, and after he had lost by death his first wife, does he not say he was compelled to pay a young woman, who was reared by him, the sum of about $500 as wages, and the further sum of $1,100, for what we cannot tell from his testimony, and to her lawyer $450. This is a beginning. In the fall of the year 1896, after his marriage, did he not deny that he slept with a negro boy for several weeks in the bed occupied usually by his wife and himself? He admits, in writing, in the month of November, 1896, just as soon almost as he stepped from the railway train in the State of Ohio, to wit: 23d November, 1896, that he began a suit for divorce from his wife, and that the grounds therefor set out in his complaint were adultery and gross neglect of duty committed by her. The adultery was charged to have been committed by his wife and a negro boy, Thomas Thompson, and also with others, on or about the 26th September, 1896, near Columbia, S. C. This was set up in his complaint on the

23d November, 1896. He sent an agent out to Richland County, in the State of South Carolina, to get up testimony for him in his divorce suit, who failed absolutely, and pronounced Daniel Wise a fool. When defendant's answer came in the divorce suit in the State of Ohio, suddenly, in writing, he signed the following paper, dated the 24th day of December, 1896 (one month and one day after he had exhibited his complaint for divorce), to wit: "In the Court of Common Pleas of Seneca County, Ohio. Daniel Wise, plaintiff, *vs.* Harriet Wise, defendant. Statement of confession by the plaintiff. The said plaintiff hereby dismisses the said case and has paid all the costs therein, and he further says that he confesses that the charge made in his petition in said action, charging the defendant with adultery and gross neglect of duty, are, as he now believes, false, and that they were made by him at the time in a sudden heat and passion, upon information that he had received from false accusers, as he has since learned, and who will not appear against the defendant to testify to such charges; and he wishes hereby to fully exonerate his wife from all the said charges and restore to her her good name and character. She may publish this in the Tiffin papers if she wishes. I sign this in the presence of T. N. Bierly and F. E. Diver. Truly, Daniel Wise. December 24th, 1896. Witnesses: Thos. N. Bierly, F. E. Diver."

Here is a bald confession of an attempt to blacken the character of a seventeen-year-old wife for life by a husband more than fifty-eight years old. Right on the heels of this terrible charge by Daniel Wise against his young wife, he began his efforts to get her to come out to Ohio and join him. No doubt, he had sent her a copy of this confession of his cowardly attack upon her. He does not send her the money to pay her way out to him, but he and his friend Brierly send a "statement" how she was to get the money to come out to Ohio. It is a unique "instrument." Here it is: "Now Hattie, we hereby make a statement how you shall get your money to come out here with. Get your ticket for Cincin-

nati, it will cost $16 or $17. You get the money for your ticket and we will send it to the parties as soon as you get here. Daniel Wise, H. B. Bierly. Direct all letters to Prairie Depot. Hattie, bring this paper with you when you come—if you can come right off, send me a message instead of writing. Send it two days before you start, and I will meet you at Knoxville. Send the message to Prairie Depot. Daniel Wise."

The suggestion is for this young, inexperienced wife to borrow, say $17, to come to the State of Ohio to meet her husband, who has just been baffled in his efforts to blast his wife's character forever. But hear his suggestion or direction: "Hattie, bring this paper with you when you come." Letters are written to her—affectionate letters are written her—in one of which he tells his wife he will have to prevaricate to his mother to explain her absence, or to use his language: "Now Hattie, I am going to Freeport and what in the world will I say to mother for she thought you would come sure. I will have to tell her you was not well enough but would soon come." His wife not being willing to go to him he comes to her. He found her at her foster parents; she was not a woman to be stamped upon at pleasure, for when he went into the home of Mr. Shroyer he found Mrs. Shroyer, and first made peace with her. Through Mrs. Shroyer, he began the effort to win back his wife's good graces. This occurred about 16th January, 1897, and was no easy work. It was only when her foster mother urged upon her the duty of forgiveness, to the end that she, too, might be forgiven, and thereupon she forgave Mr. Wise. This reconciliation is told in two different ways, one by Mr. Wise and the other by Mr. Shroyer and Mrs. Shroyer and Mrs. Wise. Which party is to be believed? Wise admits that his wife "pouted." There again Mr. Wise has great difficulty, especially under the cross-examination to which he was subjected by Mrs. Wise's attorney, John T. Duncan, Esq., in explaining his meaning in his confession, put upon the records of the Court of Common Pleas in Ohio, when he

started his divorce suit, as to the persons who made false statements about the fidelity of his wife. He, in that connection, is literally driven from pillar to post to escape the admission that he deliberately spoke falsely in his charge of adultery against her. But is this all? It is not. I linger here on this matter because to my mind the perfidy of this man is thus demonstrated. He pretends that he first heard of these matters as to adultery after he went to the State of Ohio, in November, 1896. He denies that he told Nelson Thompson anything before he left for Ohio, in November, 1896, touching the alleged infidelities of his wife; but hear what this colored man says Daniel Wise told him. I quote: "Q. Did you ever have any talk with Daniel about something he said about his wife and about you and about other people? A. Yes, sir. Q. What was the talk? A. Do you mean for me to tell you how we came to have this talk? Q. You can say that you heard something he said? A. I heard something that he was talking about me and his wife, and I went to see about it. Q. Who had such talk? A. Mr. Wise. Q. And you went to see Mr. Wise; now, what was the talk between you and him? A. I went to Mr. Wise where he was cutting wood at the wood pile, and I said 'I have come here to say something about your talk about me and your wife; I hear you are talking things about me and your wife, and I don't want anything of that kind talked about me;' and he said, 'I will tell you all about it;' I said, 'No such talk as that won't do in this country.' He said, 'I had to talk.' I said, 'What right did you have to do that?' He said, 'I gosh, I had to do something to keep up with her; for two weeks and better, she has kept me from sleeping all night.' He said, 'I throwed you up to her, and Elbert Kennedy and Thomas Thompson and Period Thompson.' Q. He threw them up to her, too? A. Yes, sir, that is what he said. Q. What did you tell him you heard he had been saying? A. I told him I heard he said I was knowing his wife as a woman. Q. He said he did it just to keep up with her, and threw Elbert Kennedy and your sons, Thomas and

Period Thompson, up to her as well? A. Yes, sir. Q. Did he pretend to say there was any truth in the statement—did he make any pretense that the charges he had made were false or true? A. No, sir, not to me. Q. When was that? A. Year before last. Q. How long before he went to Ohio? A. I really could not say how long it was—a right smart while though; it was in the early spring. He didn't go to Ohio till the fall. Q. How long had he been married then? A. He must have been married about three months. Q. How old is your son, Thomas Thompson? A. He is nineteen years old the 15th day of June last, if I make no mistake."

Do not the words of the illiterate black man go very far in arresting the attention and in carrying conviction home to the unprejudiced hearer? But, again, Mr. Wise endeavored to frighten the colored boy, Thomas, the son of Nelson, into going to Ohio in the fall of 1896 with Wise. It is true he denies it, but what of that—a man who will speak falsely in one instance will do so in others, if it happens to be to his interest to do so. Did Wise really wish his wife to go to Ohio with him in 1896? Was it to his interest to carry her to Ohio, if he desired a divorce? Did he not try to slip his action for divorce through the Court secretly? Would her presence have heightened this effort? When she reached the railroad station in the city of Columbia, without any breakfast and with her trunk, before the hour of 8:30 A. M., on the 16th November, 1896, it certainly looked as if she were ready to accompany her husband to Ohio; but this was not what he wanted—hence he not only abused her at the station, but threatened that he would give her hell when she reached Ohio; that he would make her walk naked and barefooted—that she should eat pine roots and pine straw. Hence she refused to go at the last moment that morning. It should not escape our attention that when Mrs. Wise went on Sunday afternoon to her husband at Mrs. O'Keefe's hotel, she was told by Mr. Wise that she must spend the night with her friends, Mr. and Mrs. McEachin. Does

not this look as if he did not wish her to occupy his bed? To my mind, the conclusion is almost irresistible that Daniel Wise has no regard for truth, and that his purpose was that his wife should not accompany him to Ohio on 16th November, 1896, and that he would obtain his divorce from her on false grounds. But it will be said all these things were condoned by the wife when she again became reconciled to her husband in January, 1897.

What about the charge of *saevitia* after that time? Daniel Wise is charged with language most foul, with threats of great personal violence to the wife and the child after it was born in June, 1897, and also with neglect in providing for the wife's person, both in attention and in respect to food. He denies all these things. What did Dr. Robert Earle testify in regard to these matters? I quote his testimony : "Q. Doctor, you are a practicing physician of Columbia? A. Yes, sir. Q. Were you ever called upon to attend Mrs. Harriet C. Wise, the wife of Daniel Wise? A. Yes, sir. Q. Was that in her confinement? A. Yes, sir. Q. How long? A. That was before the birth of the child. Q. How long were you in attendance upon her? A. I made three or four visits, I am not sure how many I made, but I think it was three or four. Q. Doctor, will you tell us something of the care, comforts and attention which this woman had? A. She had none whatever. I tried to get her husband to get her a midwife, or a cook, or to have something done for her, and he refused to get anybody. For that reason I had her moved to Shroyer's house. Q. Was that the first child? A. I think so. Q. About how old was the infant when it was removed? A. A few days, I don't remember exactly how old it was. Q. Do you know anything of his mode of talk or his treatment of her? A. No, sir. Q. Did you ever have occasion to attend Mrs. Wise again? A. Yes. Q. About what time? A. Some time afterwards—she was at Mr. Shroyer's at the time ; the baby and mother were both sick. Q. About how long after the birth of the child? A. Possibly two months, I don't remember the dates now. Q.

Did you have occasion to attend her again, a second time? A. I prescribed for her once or twice in my office, not more than twice, but I do not remember the dates now, but I can get them."

As usual, Daniel Wise denies all this, except that his wife and child were removed to the home of her foster parents, where she began to improve, as did also the child. Any man who has already been a parent and who has had the misfortune to lose his children, knows what delicate care and attention are due the young mother with *her first* child. Daniel Wise knew all these things, for his first wife bore him several children—only one of which lived to reach the age of five years; his first wife's health was delicate. Yet the doctor testifies that he refused to get a midwife or a nurse for his young wife. Indeed, the foster father testifies that Daniel Wise did not wish a physician called to his wife while in labor. If a man will deny medical attention to his wife in time of labor, it is difficult to understand that the same husband will deny his wife suitable food? Poor woman, she has fallen into the hands of a brute; who is there who rises to deny character to Mrs. Wise? All say her life is blameless— except, possibly, J. M. Moore, who is discharged from his position in the employ of the Electric Railroad Company upon a charge of alleged wrong doing—I believe the charge was for failure to account for some car fares; and except the man Frank Neely, who it is said ate his dinners and suppers as the guest of the negro man, Nelson Thompson, at the same table. Who rises and attacks the *credibility* of Mr. and Mrs. Shroyer? Nobody but Daniel Wise, and he only does so when in dire straits. It is true, Mrs. Wise did call her husband, Daniel Wise, a liar on one occasion, which was, of course, improper, because such words are not becoming the lips of woman. I could extend this opinion almost indefinitely in commenting upon the testimony of the different witnesses, but these matters only relate to the matters of fact, and I must be permitted to say, I have carefully considered the testimony of each witness on both sides, and I believe the

testimony that Daniel Wise threatened her with actual violence.

It follows, therefore, that there must be a modification of the decree of the Circuit Court so far as the matter of alimony is concerned. My conclusion is that our judgment should be as follows: "It is the judgment of this Court, that so much of the judgment of the Circuit Court as denies to the plaintiff the right to a deed to the real and personal property, viz: the house and lot of fifteen acres, and also the schedule of personal property attached to the complaint, must be affirmed; but that portion of the decree which denies to the plaintiff a judgment for alimony, must be reversed; and the action is remitted to the Court below to formulate a decree for alimony, and enjoining the defendant, Daniel Wise, from making any sale of his real estate in Richland County, in the State of South Carolina, until he executes a bond, to be approved by the clerk of the Circuit Court of Richland County, conditioned to fully comply with the said decree for alimony." But the majority of the Court have concluded that the Circuit Court decree should be affirmed.

Although I dissent therefrom, it is the judgment of this Court that the judgment of the Circuit Court be affirmed.

MESSRS. JUSTICES GARY and JONES *dissent, and concur in the dissenting opinion of* MR. CHIEF JUSTICE McIVER.

MR. CHIEF JUSTICE McIVER, *dissenting.* In this case I am constrained to differ with Mr. Justice Pope in the conclusion which he has reached as to one of the questions involved. Before proceeding to state the grounds of my dissent, it may be as well to state, briefly, the history of the case. While there is much conflict in the testimony as to the facts upon which one of the main issues turns, there are certain facts, as to which there is practically no dispute, which may be stated as follows: On the 8th of April, 1896, the defendant was married to the plaintiff, who was an adopted daughter of Levi Shroyer and his wife, who having no children of their

own, took the plaintiff, when she was about four years old, into their family and treated her as their own child. Both Daniel Wise, the defendant, and the said Levi Shroyer came originally from the State of Ohio, where they both enlisted in the Federal army, during the "War between the States," joining the same company, and served together as soldiers in that army. At what time Levi Shroyer removed to this State, after the war ended, does not appear, but the defendant left Ohio to attend the Atlanta Exposition, and upon his return came by Columbia for the purpose of paying a visit to his army comrade, who had settled near the city of Columbia. There he made the acquaintance of his wife, the plaintiff, and after the lapse of some four or five months he married her, with the full consent of her adopted parents—the Shroyers— and went to live on a place which he had bought, called the Sawyer place, about one-half of a mile from the residence of the Shroyers. Some time in November following—the 16th of that month, as stated by Mrs. Shroyer in her testimony— Wise left for Ohio, whether on a temporary visit or for a permanent removal, is one of the matters in dispute. It seems that while Mrs. Wise was not willing to go with her husband, she evidently consented to go, for on the morning Wise left she was at the depot, with her trunk, prepared to take the train—though for some reason, as to which there is a conflict of testimony, she, at the last moment, declined to go, and returned either to her former home or to the Shroyers, where she remained until her husband returned from Ohio, as will be hereinafter stated. Very soon after Wise reached Ohio, to wit: on the 23d November, 1896, he instituted proceedings for a divorce, charging his wife with adultery committed with a young negro fellow, named Thomas Thompson, and with others. But in just about a month afterwards, to wit: on the 24th of December, 1896, he withdrew the case, and made the public confession, in writing, that the charges were unfounded in fact, a copy of which is set out in the opinion of Mr. Justice Pope, and the same was published in the Ohio newspapers. Not long

after this—some time in January or February, 1897—the 16th of January, Mrs. Shroyer says in her testimony—Wise returned from Ohio, and went immediately from the train to the house of Shroyer, where he found his wife; and after seeking pardon for his offense in bringing the suit for divorce, the parties apparently became reconciled, and Wise went with his wife to the Collins place near by, which he had rented until his house on the fifteen acre tract referred to in the complaint was finished, and then removed to that house, within about 100 yards from the residence of the Shroyers. There they continued to live together as man and wife until about the 3d of February, 1898, when Wise left and went to Columbia to live in rooms at the Congaree Hotel. In the meantime, to wit: on the 3d of June, 1897, Mrs. Wise gave birth to a child. It seems that Wise attempted to persuade his wife to go with him to live in Columbia, and evidently supposed she had consented to do so, as he sent a carriage to take her to the city and a wagon to remove her things; but at the last moment she refused to go. On the 16th of February, 1898, this action was commenced, for the double purpose of obtaining a decree for the specific performance of an agreement which she alleges her husband entered into, to convey to her the fifteen acres of land above referred to, and also certain articles of personal property, a list of which is filed, as an exhibit to her complaint, and also for the purpose of obtaining a decree for alimony.

The case was heard by his Honor, Judge Buchanan, who rendered the following decree: "After a full consideration of the testimony in this case, and the arguments of counsel, my conclusion is that the plaintiff has not sustained the allegations of her complaint by the preponderance of the testimony. On the contrary, I am convinced that the defendant has not deserted his wife, but she him; and moreover he has offered, in good faith, I think, to receive her back, which will prevent a decree for alimony. *Hair* v. *Hair,* 10 Rich. Eq., 163. Nor do I find in the case any legal testimony which would justify the Court in directing the defendant to convey

the land mentioned to his wife. Therefore, she is not entitled to any of the relief demanded by her; but as the testimony shows that she has taken and retained possession of the land described in the complaint, her rights to which she submitted to this Court for adjudication.

"It is ordered and decreed, that defendant have leave to enter up judgment of dismissal of complaint, with a direction to the plaintiff to surrender to him, without future waste, the possession of the lands described in the complaint."

From the judgment entered on this decree the plaintiff appeals upon the several grounds set out in the opinion of Mr. Justice Pope. Inasmuch as so much of the decree of the Circuit Judge as denies to the plaintiff the right to specific performance of the agreement alleged in the complaint, is affirmed in the leading opinion, to which I assent, that question may be dismissed from further consideration here. My remarks, therefore, will be confined exclusively to the question whether the Circuit Judge has erred in denying to the plaintiff her demand for alimony.

It may be said to the credit of the people of this State that cases of this character are of very rare occurrence. For upwards of half a century our books of Reports disclose but three cases of that character; and even prior to that time but few cases of the kind are to be found. The law, however, upon the subject seems to be well settled. See *Rhame* v. *Rhame,* 1 McC. Ch., 197; *Hair* v. *Hair,* 10 Rich. Eq., 163, and *Briggs* v. *Briggs,* 24 S. C., 377. The last case upon the subject is *Smith* v. *Smith,* which is twice reported in 50 S. C., 54, and next in 51 S. C., 379. But as both of those appeals involved questions of pleading and practice in alimony cases, which are not involved here, they do not throw any light upon the questions here; though it may be stated that in the first of these appeals—the case of *Rhame* v. *Rhame, supra*—which will be considered, is cited with approval. There is, however, a fourth case which came before the Court of Appeals during the last half century— *Thompson* v. *Thompson,* 10 Rich. Eq., 416; but as that case

deals rather with the circumstances which should affect the amount of alimony to be allowed, after the right to alimony is established, it need not be considered here.

In *Rhame* v. *Rhame, supra,* Mr. Justice Nott, in delivering the opinion of the Court of Appeals, after saying that, in England, alimony is allowed only where a separation is decreed, and that although our courts of equity have not the power to grant divorces, yet as the two subjects, "divorce" and "alimony," are inseparable companions in England, we must look to the causes of divorce, to ascertain the grounds on which alimony will be allowed, proceeds to cite the following language used by Sir William Scott (afterwards Lord Stowell), in the case of *Evans* v. *Evans,* 1 Hagg. Rep., 39, which was an application for a divorce on the ground of cruelty: "In the oldest cases of this sort which I have had an opportunity of looking into, I have observed that the danger of life, limb or health is usually inserted as the ground on which the Court has proceeded to a separation. This doctrine has been repeatedly applied by the Court in the cases that have been cited. The Court has never been driven off this ground. What merely wounds the mental feelings is, in few cases, to be admitted, where they are not accompanied with bodily injury, either actual or menaced. Mere austerity of temper, petulance of manner, rudeness of language, a want of civil attention and accommodation, even occasional sallies of passion (if they do not threaten bodily harm), do not amount to legal cruelty." And again he cites with approval the language used by the same distinguished Judge, in *Oliver* v. *Oliver,* 1 Hagg. Rep., 364, where he says: "Words of menace, importing actual danger of bodily harm, will justify the interposition of the Court, as the law ought not to wait until the mischief is actually done. But the most innocent and deserving women will sue in vain for its interference for words of mere insult, however galling."

In *Hair* v. *Hair,* 10 Rich. Eq., 163, Dargan, Ch., in delivering the opinion of the Court, after citing and commenting with approval upon the above cited case of *Rhame* v. *Rhame,*

uses this language: "In pursuance of the decisions and practice of the Ecclesiastical and Consistorial Courts of England, in South Carolina alimony is granted for bodily injury inflicted or threatened and impending, amounting to the *saevitia* of the civil law, which may be defined to be personal violence actually inflicted or menaced, and affecting life or health. Alimony is also granted in South Carolina for the desertion of the wife by the husband. To these may be added a third class of cases, in which, though the husband has inflicted or threatened no bodily injury upon the wife, yet practices such obscene and revolting indecencies in the family circle, and so outrages all the sentiments of delicacy and refinement, characteristic of the sex, that a modest and pure-minded woman would find these grievances more dreadful and intolerable to be borne than the most cruel inflictions upon her person." And finally, in concluding this branch of his opinion, the learned Chancellor says: "Except in cases embraced within the three classes above commented on, I am not aware that a suit for alimony has been sustained in South Carolina." The case of *Hair* v. *Hair* is cited with approval in *Briggs* v. *Briggs*, 24 S. C., 377, which is the last case which I have been able to find in which the Courts of this State have considered a case of alimony on its merits—the case of *Smith* v. *Smith, supra,* as has been said, turning only upon questions of pleading and practice.

It may, therefore, be safely said that, in this State, alimony will not be granted except for one or more of the three causes stated by Dargan, Ch., in *Hair* v. *Hair, supra,* which may be briefly recapitulated as follows: 1st. Desertion of the wife by the husband—without just cause, I would add. 2d. Where the husband inflicts upon his wife or threatens her with bodily injury, amounting to the *saevitia* of the civil law, which is defined "to be personal violence actually inflicted or menaced, and affecting life or health." 3d. Where the husband practices such obscene and revolting indecencies in the family circle, and so outrages all the sentiments of delicacy and refinement, characteristic of the sex, that a modest

and pure-minded woman would find these grievances more dreadful and intolerable than the most cruel inflictions upon her person. I do not exactly understand upon which of these three grounds Mr. Justice Pope bases his conclusion that the plaintiff is entitled to alimony; and, therefore, they must all be considered.

1st. As to desertion. There seems to be two occasions on which it is claimed by the plaintiff that she was deserted by her husband. First, in November, 1896—about seven months after the marriage—when the husband went to Ohio; and next, on the 3d of February, 1898, when the husband went to Columbia and took up his home at the Congaree Hotel. I agree with the Circuit Judge that it is shown by the preponderance of the evidence, that on both of these occasions, so far from the husband deserting his wife, she deserted him. It must be remembered that, under the law as it stands here, as well as everywhere else, so far as I am informed, the husband has an absolute right to establish his domicile or place of residence wherever he pleases, either with or without the consent of his wife; and it is equally her duty to go with him or follow to the place of residence chosen by him. As is said by Dargan, Ch., in *Hair* v. *Hair, supra,* at page 175: "Certainly the husband, by our laws, is lord of his own houshold, and sole arbiter on the question as to where himself and family shall reside." And again, on the next page he uses this language: "The husband has the right, without the consent of the wife, to establish his domicile in any part of the world, and it is the legal duty of the wife to follow his fortunes wheresoever he may go." As to the first alleged desertion, it seems to me that it is shown by the clear preponderance of the evidence that the defendant dsired his wife to go with him to Ohio, and that she had actually consented (reluctantly, it may have been,) to go with him, and did go to the depot in Columbia, with her trunk, for that purpose; but after reaching the depot something occurred, as to which there is much conflict of testimony, which induced her to decline going with him, and she

returned to her adopted parents, the Shroyers. I do not propose to go into any detailed discussion of the testimony in this case, as that would serve no useful purpose; and will confine myself to a statement of the general impression which has been made upon my mind by a careful reading of the testimony, covering about three hundred typewritten pages. Whatever differences of opinion may once have existed as to the rule which should govern where an appellant, as in this case, asks this Court to reverse the findings of fact by the Circuit Judge, in an equity case, it must now, since the decision in *Finley* v. *Cartwright,* 55 S. C., 198, be regarded as settled, "That this Court may reverse a finding of fact by the Circuit Court when the appellant satisfies this Court that the preponderance of the evidence is against the finding of the Circuit Court." So that the practical inquiry in this case, in which the Circuit Judge has found the contested issues of fact in favor of the defendant, or, to use his own language: "That the plaintiff has not sustained the allegations of her complaint by the preponderance of the testimony," as every plaintiff is bound to do, is, whether the appellant has satisfied this Court that the findings of fact by the Circuit Court are against the preponderance of the evidence. It will thus be seen that both in the Circuit Court and the Supreme Court, the burden of proof is upon the plaintiff—in the former to sustain her allegations by the preponderance of the evidence, and in the latter to satisfy this Court that the findings of fact by the Circuit Court are against the preponderance of the evidence.

In view of the direct conflict of testimony upon most of the material issues of fact, it may throw some light upon the question as to where the preponderance of evidence lies, to look at some of the undisputed facts. Here was an old couple, Levi Shroyer and wife, who having no children of their own had adopted the plaintiff, and thereby assumed the obligations of parents to their child. When this girl, not more than seventeen or eighteen years of age, was sought in marriage by the defendant, who was a widower approaching

29—60

the age of sixty years, the Shroyers not only offered no opposition to the marriage but manifestly encouraged it. Why? The testimony shows that they supposed the defendant was a person of large means, and their conduct indicates that their motive was to obtain for their daughter, and perhaps, incidentally, for themselves, a share of his large property. But very soon after the marriage, finding that their expectations, based upon what they supposed to be the handsome estate of the defendant, were unfounded, they commenced a systematic effort to bring about a separation of the newly married couple. The first cause of a quarrel or dissension between this husband and wife is stated to have occurred in a very short time—only three weeks after the marriage—and the cause of that quarrel, as stated by the plaintiff, who, I must believe, acted throughout under the influence of the Shroyers, is of such a character as to render such statements not only absolutely incredible, but absurd on its face. That cause, as she stated, was that her husband found fault with her because she had not conceived. How was it possible for her or any one else to ascertain the fact within the short space of three weeks after marriage, it is impossible to understand. It is absurd to suppose that this man, who had been previously married and had been the father of several children, could have been supposed to know or could have pretended to know in so short time after marriage, whether his wife had or had not conceived; and the statement that he made that a cause of quarrel with her, is so absurd as to render that statement utterly incredible. Then, too, the statement that he had proposed to his young wife, about two months after the marriage, that she should have sexual intercourse with two negro boys, and the reason he is alleged to have given for such a foul proposition, expressed in language too vile and obscene to be repeated here, is utterly incredible, in view of the testimony as to the character which all his neighbors give him; even Levi Shroyer himself saying that up to the time of his marriage he was one of the finest gentlemen he ever knew—and he did know

him well, having served with him in the Federal army in the same company. So, too, the testimony of the Shroyers as to the fact that the defendant was in the constant habit of cursing and abusing his wife in the vilest language, and in tones so loud that he could be heard at their house, distant about 100 yards, and yet not a single neighbor can be produced who ever heard him using such language when passing along the road, which was about sixty feet from the house. On the contrary, every neighbor and every visitor at the defendant's house, who was examined—and there was quite a number of them put upon the stand—with the exception of the Shroyers, testify that they never on any occasion heard the defendant use either profane or vulgar language. Even the colored witness, Nelson Thompson, who seems to have been seen about the premises a good deal, and appears to be much relied upon by the plaintiff, is forced to admit on his cross-examination that he never heard the defendant use either profane or vulgar language, and that defendant always treated his wife kindly; and that she was always cross to her husband when she returned from visits to the Shroyers. Again, as to the charge that defendant did not supply his wife with sufficient food and clothing, testified to by the Shroyers; it is completely overthrown by the testimony of the neighbors, some of whom took meals at defendant's house and always found the table well supplied, and that Mrs. Wise always seemed to be dressed well. This is supported by the testimony of several merchants in Columbia, who sold defendant supplies every week amply sufficient for his family, and some of them sold him goods suitable for ladies' wear. Also by the testimony of the two motormen on the street cars, who frequently saw plaintiff on the cars and that she was always well dressed, and one of them testifying that she had shown him a gold watch which she said her husband gave her, saying that she had married an old man, who was very good to her, giving her whatever she wanted. Also by the testimony of the witness, Neeley, who said he worked for defendant about a

month, took his meals at defendant's house, found the table well supplied, and that defendant always treated his wife kindly. It is true, that plaintiff's standing witness—the negro, Nelson Thompson—was put up in reply to contradict Neeley, and also to impeach the character of the motorman who testified as to the gold watch, by saying that he had heard that this man was discharged for stealing car fares, though no officer of the street car company was put up to sustain any such charges, and no other witness except this negro, Nelson Thompson, was examined to impeach the testimony of either this motorman or Neeley, or any other witness for the defendant. It is also true, that soon after the defendant reached Ohio, he commenced an action against his wife for divorce, in which he charged his wife with adultery; but within a month after this action was commenced, the defendant not only withdrew the suit, but published a card in the newspapers, completely exonerating his wife from the charges made against her. A copy of this card was doubtless sent to his wife, as it was offered in evidence by her at the trial, and as it is set out in the opinion of Mr. Justice Pope, its terms need not be referred to further here. Having thus made such reparation as was possible for this gross insult to his wife, which was utterly indefensible, he attempted by correspondence with his wife to bring about a reconciliation between them; and failing in this, he returned to South Carolina, some time in January or February, 1897, and immediately upon his arrival went to the house of the Shroyers, where he found his wife, and eventually succeeded in effecting a reconciliation. From this time forward, the parties lived together as man and wife for about twelve months, the wife in the meantime, to wit: on the 3d of June, 1897, having given birth to a child, while occupying a house built by defendant on a place which, at her instance, he had bought, quite near—within 100 yards of—the home of the Shroyers.

Now, taking the view of the testimony most unfavorable to the defendant, and granting (for the sake of argument

only) that the testimony shows that the defendant deserted his wife in November, 1896, and was guilty of the charges of marital offenses committed before that time, yet such conduct on the part of the husband would afford no ground for the wife's claim of alimony, as such offenses were condoned by the reconciliation which took place either in January or February, 1897, and the living together by the parties as man and wife after such reconciliation for about twelve months. If, therefore, the plaintiff is entitled to her claim of alimony, the grounds of such claim must be sought for in the conduct of the husband after such reconciliation took place. First, then, as to the alleged desertion on the 3d of February, 1898. It seems to me that the testimony, so far from showing that the defendant deserted his wife on that occasion, shows on the contrary that she deserted him, by refusing to go with him when he took up his residence in Columbia. As has been shown above, the husband has a clear legal right to change his place of residence whenever he sees fit to do so, either with or without the consent of his wife, and she is bound to follow him wherever he chooses to go. If, as he says, he found after the experiences of a year he could not live in peace and quiet so near the Shroyers, who seemed to exercise such an unhappy influence over his wife, he had a perfect right to change his place of residence. But even disregarding his own testimony as to the cause of his desire to move away from the immediate neighborhood of the Shroyers, he, nevertheless, had a legal right to do so, whether he had good cause to do so or not; and his doing so gave his wife no legal grounds for complaint. It is clear, therefore, that the alleged desertion in February, 1898, affords the plaintiff no ground for her claim of alimony, even if the testimony tending to show that he wanted and expected his wife to go with him to Columbia, as evidenced by sending a carriage for her and a wagon to move her things, should be disregarded.

The next inquiry, therefore, is whether either of the other grounds for alimony as recognized by the law in this State,

is established by the preponderance of the evidence? Did
the defendant, after the reconciliation took place, treat his
wife with such cruelty as amounted to the *saevitia* of the
civil law? The testimony on the part of the plaintiff,
coming from Levi Shroyer and his wife and a negro girl
in the employment of the Shroyers, is to the effect that very
soon after the reconciliation the defendant commenced and
kept up the same kind of treatment as that to which he had
subjected his wife before he went to Ohio; but this testi-
mony was of a general character, and did not show any par-
ticular acts, except in two instances which will presently be
considered; and it is entirely overbalanced by the testimony
of the neighbors and persons who visited at the house.
There is not a particle of testimony tending to show that
the defendant ever inflicted any personal violence upon his
wife. The only particular instances referred to is the threat
to chop the wife's head off with a butcher knife, and the
threat to kick her down the steps. This depends upon the
testimony of Levi Shroyer and his wife, who says that she
heard the threat to chop off her head over at her house, a
distance of about 100 yards, and Levi Shroyer says he heard
it while at work in his field, and yet neither of them went to
the rescue of their adopted daughter. These threats, if
made at all, were made, according to the testimony, about
two weeks before the birth of the plaintiff's child; and it
does not appear that the plaintiff sought refuge at the house
of her parents by adoption, which was so near. It is
manifest, therefore, that these threats, if made, excited no
apprehension of danger to the wife, and were regarded as
mere "sallies of passion"—to use the language of Sir Wm.
Scott, above quoted, which do not amount to "legal cruelty."
Besides, it is very singular that the defendant, whose only
cause of complaint (as these witnesses represent) against
his wife was her inability to gratify his desire for offspring,
should have suddenly broken out into such violent threats,
when her condition made it patent that she was about to
gratify his desire, and did, in about two weeks afterwards,

give birth to a child. The whole thing is incredible. But even if it were true, it would afford no ground for alimony in this case, for the reason why threats unaccompanied by actual violence are regarded as sufficient to amount to the *saevitia* of the civil law, is that they excite apprehensions of serious bodily harm, which would justify a wife in leaving her husband, or refusing to go with him when he changes his place of residence. But this cannot be said in this case, for the undisputed testimony is that the plaintiff continued to live with her husband in a house by themselves, where she had been in much more danger than if she had gone to live with her husband at the hotel in Columbia, where she would be surrounded by people who could have protected her from the violence of her husband, if she really had any apprehensions of such violence. The next particular instance referred to by these witnesses is the alleged refusal by the husband to allow his wife to put a clean tablecloth on the table, and upon another occasion requiring her to use a carpet as a tablecloth, which, if true, are very reprehensible, but they certainly do not amount to legal cruelty. The testimony of Dr. Earle, in regard to the failure of the defendant to provide his wife with proper comforts and attention during her confinement, which, of course, is accepted as entirely true, would, without explanation, place the defendant in a very unfavorable light; but whether it would establish such "legal cruelty" as the law recognizes as a ground for alimony, may well be doubted. But that is explained by the testimony of the defendant, that he offered to hire additional help and actually did hire Ida Thompson, a colored woman (a fact admitted by Mrs. Shroyer in her testimony), but she was discharged at the instance of Mrs. Shroyer, as the defendant says.

The third ground upon which alimony will be granted must next be considered—and that is where the husband "practices such obscene and revolting indecencies in the family circle, and so outrages all the sentiments of delicacy and refinement, characteristic of the sex, that a modest and

pure-minded woman would find these grievances more dreadful and intolerable to be borne than the most cruel inflictions upon her person." It will be observed that the word used is *"practices,"* which implies the doing of some act, and does not include mere language, however indecent it may be; and this is fully shown by the language used by Dargan, Ch., in delivering the opinion of the Court in the same case (*Hair* v. *Hair, supra*), from which the above quotation is taken, where he says: "that no words of reproach and insult amount to legal cruelty; and no affront and indignity, no torture of the feelings and sensibilities, however severe and grievous to be borne, unaccompanied by bodily injury, or a well-grounded apprehension of such, will authorize the wife to leave the bed and board of her husband, and to claim thereupon from this Court a decree for alimony." The rule contemplates such a case as *Jelineau* v. *Jelineau,* 2 DeS., 45, or *Williams* v. *Williams,* 4 DeS., 183, where the husband took his mistress into the house with his wife and allowed her to eat at his table. In this case there is not a tittle of testimony showing that the husband was guilty of any such conduct, and, therefore, the plaintiff has failed to establish her right to alimony on this ground.

But in addition to all this, there is another ground which would fully justify the Circuit Judge in refusing to allow the plaintiff alimony, and that is the offer of the defendant to receive his wife into his home and treat her as a wife should be treated. This offer the Circuit Judge finds was made in good faith, and I am unable to find any testimony showing or tending to show the contrary.

I think, therefore, that the judgment of the Circuit Court should be affirmed, and this being the conclusion of the majority of the Court.

The judgment of this Court is that the judgment of the Circuit Court be affirmed.