## LEVIN v. LEVIN.

ALIMONY.—Rules governing the granting of alimony stated. Under
the facts in this case, the Court concludes that the husband's acts
of cruelty justified his wife in separating from him; that while
her behaviour has not been faultless, her fault had such excuse
as to make it insufficient to deprive her of support for herself and
her child; that her claim is not barred by condonation; and that
she had sufficient reason to decline her husband's invitation to go
to his home as his wife.

Before PURDY, J., Charleston, August, 1903.    Reversed.

Action by Dora Levin against Hyman Levin. From
judgment for defendant, plaintiff appeals.

*Messrs. Bryan & Bryan, for appellant* (oral argument).

*Messrs. Mordecai & Gadsden,* contra, cite: *Alimony—
when granted:* 1 McC. Ch., 114; 1 Hagg's R., 39; 2 DeS.,
45; 3 DeS., 33, 74, 167, 183; 10 Rich. Eq., 163; 24 S. C.,
377; 60 S. C., 426. *Offers to receive back—their value to
defeat claim for alimony:* 2 DeS., 45; 4 DeS., 33, 79, 94,
167; 1 McC. Ch., 197; 10 Rich. Eq., 163; 24 S. C., 377.
*Against temporary alimony and counsel fees:* 19 How. Pr.,
539; 28 Id., 219; 8 N. J., 563; 7 N. J. Eq., 98; 51 S. C., 379.

February 29, 1904.   The opinion of the Court was delivered by

MR. JUSTICE WOODS.   Hyman Levin and Dora Friedman were married on October 15, 1899.   After a short bridal trip they lived together at the home of the wife's father in New York until November 1, 1899.   Levin then returned to his home in Charleston.   Mrs. Levin did not accompany him, but continued to live with her father, and has continuously refused to go to her husband's home and assume the position of a wife.   She commenced this action for alimony on October 26, 1901, alleging, under a number of specifications, cruel and inhuman treatment, sufficient, as she insists, to justify her in refusing to cohabit with her husband and in demanding separate support.   The defendant denies the charges and undertakes to lay the blame of separation entirely on his wife and her parents.   The cause was referred to G. H. Sass, Esq., master, and his report finding against the plaintiff has been reviewed and confirmed by the Circuit Judge.

The findings of fact in the report and the decree are of great value, not only on account of the sources from which they come, but because of the earnest consideration manifestly given to the cause.   A careful study of the evidence leads to the conviction that these findings as to the essential issues are in the main correct.   The chief question for discussion is as to the correctness of the legal conclusions drawn by the master and the Circuit Judge from the facts.

The grounds upon which alimony should be allowed are thus stated in *Wise* v. *Wise,* 60 S. C., 447, 38 S. E., 794, after a review of the decisions in this State: "1st. Desertion of the wife by the husband—without just cause * * * 2d. Where the husband inflicts upon his wife or threatens her with bodily injury, amounting to the *saevitia* of the civil law, which is defined 'to be personal violence actually inflicted or menaced, and affecting life or health.'   3d. Where the husband practices such obscene and revolting indecencies in the family circle, and so outrages all the sentiments of

delicacy and refinement, characteristic of the sex, that a modest and pure-minded woman would find these grievances more dreadful and intolerable than the most cruel inflictions upon her person."

It should not be supposed that a separate support must be denied to the wife under the second proposition, because the personal violence on account of which it is claimed does not actually imperil her life or health; it is sufficient if it tends to do so. Great and continued physical indignities, such, for example, as chastisement or imprisonment, might possibly not endanger life or health, but certainly a wife is not called upon to endure them. It should also be said in this connection that the time has passed when assent can be given to the statement made in *Hair* v. *Hair,* 10 Rich. Eq., 173: "No words of reproach and insult amount to legal cruelty; no affront and indignity, no torture of the feelings and sensibilities, however severe and grievous to be borne, unaccompanied by bodily injury, or a well grounded apprehension of such, will authorize the wife to leave the bed and board of her husband, and to claim thereupon from this Court a decree for alimony."

At the same time, we fully accept the language used in *Evans* v. *Evans,* 1 Hagg. Rep., 39, quoted with approval in *Rhame* v. *Rhame,* 1 McCord Ch., 206: "What merely wounds the mental feelings is, in few cases, to be admitted, where they are not accompanied with bodily injury, either actual or menaced. Mere austerity of temper, petulance of manners, rudeness of language, a want of civil attention and accommodation, even occasional sallies of passion (if they do not threaten bodily harm), do not amount to legal cruelty." One of these *few cases* arises when a husband habitually uses to his wife abusive language which she cannot endure without a complete surrender of self-respect, or strikes at the vital point of female character by making and maintaining the charge of unchastity. The husband's right of dominion and the wife's duty to live with him and obey him cease to exist when the husband ceases to support

them by at least decent respect and consideration.

The general view of the law above stated will, no doubt, receive ready assent; but the delicacy of the subject makes the application of principle to the facts of each case the real judicial task.

While each case that has arisen in this State differs widely as to its facts from every other, a review of the cases leads to the conclusion that the decision of this case should depend upon the following questions: 1. Has the defendant inflicted on the plaintiff such physical violence or personal indignity as would make her residence with him as a wife intolerable? 2. Has the wife deserted her husband or so contributed to the alienation that the law will deny her separate support? 3. Has the wife so condoned the alleged wrongs that her claim must fail? 4. Does the defendant's invitation to the plaintiff to come to his home as his wife discharge him of any liability he may have incurred for her separate support?

It may be well to remark before beginning the discussion of these questions, that we attach slight importance, except as a mere side-light, to the fact that the acquaintance of these parties was brought about through the intervention of a match-maker employed by Levin and the parents of Mrs. Levin, and the marriage itself based more on convenience than sentiment. The Court in a case of this kind has little to do with the finer sentiments and emotions of conjugal life, and must concern itself with the right of the wife to be protected from cruelty and indecency.

A number of charges are made against Levin. The first accusation, that he was very drunk on his wedding night, is clearly proved, and it cannot be doubted that this misconduct brought to his bride great mortification and disgust. Some excuse is to be allowed in the fact that he had been fasting for a day under the Jewish law, and did not take proper account of the effect of wine on an empty stomach. If the occasion had been an ordinary one, the drunkenness would, no doubt, be excused by all the charitable as accidental, but it is not easy to see how the instinct

of ordinary self-respect could have been so off-guard on his wedding night. This offense, however, was forgiven, and no doubt its effect on the wife's feelings would have been obliterated if the impression of lack of sensibility had not been deepened by subsequent misconduct.

Levin's explanation of registering with his wife at the St. Dennis Hotel under an assumed name, is sufficient to make the impropriety of little consequence in this inquiry.

Mrs. Levin testifies that on the bridal trip to Baltimore the defendant forced sexual intercourse against her will, called her "flirt and loafer," telling her "to go to the devil" or "to go to hell," in anger struck her in the face and nearly pushed her down the stairs. Whether all these cruelties were perpetrated, it is impossible to say with certainty, for they rest in assertion by the wife and are met by denial of the husband. It cannot be doubted, however, that there were serious disagreements on this unhappy journey arising from the husband's grossness of conduct and jealous disposition.

After this they returned to the home of Mrs. Levin's parents and lived together as husband and wife for a week or more. For some reason, during this period, Mrs. Friedman became solicitous about her daughter's physical condition and had an examination by a physician, from which she received the impression that Mrs. Levin was pregnant. Levin insisted that he had not known his wife sexually, and we cannot doubt that in her father's house he strongly intimated, if he did not directly charge, that if his wife was pregnant, she had been unchaste.

While there is much conflict, we think the testimony sustains the master and Circuit Judge in finding that Levin, before leaving New York, insisted on sexual intercourse at a time when his wife's physical condition made his doing so indecent. It appears that this became so repulsive to her that she left his room and sought refuge with her mother. The details of the testimony on this point are too revolting to be recited. It is sufficient to say that plaintiff's physical condition was such that it would be difficult to imagine any-

thing more disgusting and distressing to a decent woman than the defendant's conduct in this respect towards her.

When the defendant left New York, his wife was painfully if not seriously ill, and in great distress. He testifies that he believed she was shamming; and there is no doubt that her statement is true, that he actually charged her with pretending to be sick, without having, so far as we can discern, the slightest ground for the imputation. In addition to all this, Levin on his departure failed to leave his wife any money or to make provision of any kind for her maintenance and comfort.

It may be that any one of the wrongs done by Levin standing alone might be regarded as only "a sally of passion," or a somewhat abnormal development of human weakness, to which in some degree many men may be subject, and which ought to be borne by a wife as incidental to an unfortunate alliance. But considering all the outrages together, perpetrated as they were when his wife was a young bride, having a right to expect even from a husband of the commoner sort, at least respectful consideration, we cannot resist the conclusion that they amount to intolerable cruelty, justifying her separation from him.

We think the evidence sustains the opinion that the plaintiff's refusal to accompany her husband to Charleston was due to her sickness and also to her aversion to him arising from ill-treatment.

The real defense up to this point, linked to a total denial of all improper conduct, except drunkenness, on the part of the defendant, is the allegation that all the matrimonial differences arose from the officious intermeddling of Mrs. Friedman, the plaintiff's mother. While the failure of the plaintiff to have her father and mother to testify has not impressed us favorably, we have sought in vain for facts adequate to support this defense. Mrs. Friedman was satisfied with the alliance, and in defendant's behalf had induced her daughter to be reconciled to him after his drunkenness. This kindly attitude, even if her temper was not of the best, is

entirely inconsistent with Levin's statement that upon his return from the bridal tour, without any provocation, Mrs. Friedman became prejudiced against him and determined to separate her daughter from him.   Nor does the evidence bear out the allegation, pressed with so much vigor in argument, that plaintiff's parents were determined all along that their daughter should not live in Charleston, being willing to separate her from her husband to prevent her doing so, and that this is the secret of the separation; for after the marriage Mrs. Levin's personal apparel and all the wedding presents were packed by Levin and shipped to Charleston, with the apparent acquiescence of the entire family.   This theory requires for its support much stronger evidence than is offered here.   It is against nature that parents should be anxious to separate a daughter from her husband and thus wreck her life in order to keep her at home.

We next inquire, Has the wife deserted her husband, or so contributed to the alienation that the law will deny her a separate support?   Having already held that she committed no breach of duty in separating herself from her husband, it follows that she did not in any legal sense desert him.

One phase of Mrs. Levin's conduct which has given rise to the greatest perplexity in the effort to reach a just conclusion, is the accusation made by her that her husband had imparted to her a repulsive disease.   She does not allege this as one of her grounds of action, but it is considered here for the reason that if she falsely and recklessly made such a charge, in connection with her refusal to live with her husband, she would be entitled to no relief.   The charge she made was on the trial completely disproved by the best evidence on the subject that could then be offered.   We hold that Levin did not have such a disease and, therefore, could not impart it.   Nevertheless, it cannot be said that Mrs. Levin is subject to great censure for entertaining the opinion she expressed.   The attending physician discussed her symptoms with her or her mother, and while he did tell them

9—68

that he could only be sure of the cause which produced them by the use of the microscope, yet it is manifest from his testimony that he regarded these unusual symptoms as probably indicating venereal disease, and this view was no doubt expressed at that time as strongly as it was in his testimony. Mrs. Levin cannot be acquitted of a lack of care in not doing what she could to relieve her husband of this dreadful imputation by procuring a microscopic examination, as suggested by the physician; but it must be remembered that Levin knew of his wife's condition, and her belief as to the cause, before he left New York, and yet he left with this shocking charge hanging over him, without even seeing the physician who had made the examination and.from whom, as we must suppose, the impression came.

It is said in *Hair* v. *Hair, supra,* that "the conduct of the wife must be blameless. If she elopes, or commits adultery, or violates or omits to discharge any of the important hymeneal obligations which she has assumed upon herself, the husband may abandon her without providing for her support." It is not meant by this that a wife must be perfect—her conduct absolutely free from fault—in all distressing circumstances. It does not mean that when her husband has brought upon her great wrongs sufficient to sustain her appeal to the courts she must be entirely free from imputing to him other wrongs of which he is not guilty. We do not think, when all the circumstances are considered, such blame attaches to the plaintiff as should defeat her action.

We next inquire, Is the defendant protected from his wife's claim by condonation of his offenses? It is quite clear that a decree for alimony cannot be based upon wrongs which have been condoned, all misconduct having ceased after such condonation. But to hold that cruelties of a husband which have been forgiven are not to be considered when others have followed until the wrong becomes unbearable, would not be to give encouragement and support to a wife's patient endurance but to mock at it. In such case, as

is said in *Threewits* v. *Threewits,* 4 DeS., 574, the wife has a right to judge of the future by the past; and the court will connect the whole of the husband's conduct, in order to form a correct judgment. The case of *Wise* v. *Wise, supra,* is not in conflict with this view, because the conditions under which the condonation was there held a bar are essentially different from those existing here.

The last inquiry is, Does the defendant's invitation to the plaintiff to come to his home as his wife discharge him from any liability he may have incurred for her separate support? At the outset of the discussion of this question it is proper to remark that ordinarily evidence as to negotiations for settlement should be excluded, but in this case these negotiations were brought into the issue by the answer, and we do not perceive how testimony concerning them could have been rejected by the master or could now be excluded from consideration at the defendant's instance.

When the past misconduct of a husband has justified his wife in leaving him, it is too obvious for argument that a mere invitation to her to return to him does not impose upon the wife any obligation to comply with her husband's wish at the risk of receiving like treatment. Under the decisions of this State and elsewhere, his invitation must be accompanied by such expressions of sorrow as would lead a court to hold that the wife had reasonable ground to expect ordinary respect and consideration in future. Levin's position from first to last, except as to the drunkenness, has been one of absolute self-justification and denial of wrong, laying all the misconduct at the door of the wife and her parents. But aside from this, and attributing to the defendant an honest conviction that he did nothing while his wife was cohabiting with him that was not strictly within his marital rights, her refusal to return was justified by his charge of unchastity. That he made the accusation before parting with his wife, cannot be doubted. He himself testifies that his suspicions were removed on the birth of the child. Yet, after this, when professing to wish his wife to come to him, assur-

ing her by letter that he did not blame her, but her mother, for any wrong done to him, he says no word of retraction or regret.   He sends Mr. Banov to influence his wife to come to him, who returns with a written retraction for his signature, which she asks at his hands, but the paper is not signed. Levin's attorney, Mr. Mordecai, says he told Mr. Bryan, attorney for Mrs. Levin, before this suit was brought, that she would come out of court "with her character as a wife ruined."   Whatever meaning Mr. Mordecai may have intended to convey by this language, in view of the serious charge of unchastity before made and apparently adhered to, it must have meant to her a threat to establish this charge. An invitation extended under such circumstances as these we cannot hold a wife bound to accept.

We conclude that Levin's acts of cruelty justified his wife in separating from him; that while her behavior has not been faultless, her fault had such excuse as to make it insufficient to deprive her of support for herself and her child; that her claim is not barred by condonation; and that she had sufficient reason to decline her husband's invitation to go to his home as his wife.

The consideration of the mass of nauseous testimony will not leave in an impartial mind any hope of reconciliation of these parties.   This complete alienation has come almost entirely from the gross misconduct of the defendant, and we cannot exempt him from the support of his penniless wife and dependent infant.

The judgment of this Court is, that the judgment of the Circuit Court be reversed, and that the cause be remanded to that Court for the purpose of ascertaining and adjudging a proper allowance for the expenses of this suit, and reasonable alimony for the plaintiff, having in view all the circumstances of the husband and wife.